KLIEBERT, Judge.
Woodrow Chabert, plaintiff, (claimant) appeals from a judgment of the District Court upholding a denial of his claim for disability benefits against the Board of Trustees for the Police Pension and Relief Fund for the City of Westwego (Board). The issue presented on appeal is whether the disability complained of by the claimant at the time of trial was the result of an injury sustained while in the performance of his duties as a police officer and was he in fact disabled at the time of trial. The trial judge concluded the Board was in error in holding that the claimant was not injured while in the performance of his duties as a police officer, but held the Board was correct in concluding there was no connection between that injury and the claimant’s present condition. We agree with the trial judge and, therefore, affirm his decision.
The claimant was a policeman and former member of the Board. On February 24, 1974, following the conclusion of the Poseidon Parade in Westwego, the police chief and his men, including the claimant, were *1191 in the process of clearing the streets of people to permit the flow of vehicular traffic on the street. Parked on the side of the street was a flat bed truck and a “low boy” trailer which had been supplied by Mr. James Tassin, an alderman for the City of Westwego. Mr. Tassin approached the police chief, and according to Mr. Tassin, “to try and find out from the chief what was going on”. Exactly what occurred thereafter depends on which witness’ version of the incident is accepted. All, however, agree the claimant was in the process of arresting Mr. Tassin when an altercation occurred and it took several police officers to make the arrest. The claimant contends that during the scuffle he was thrown against the truck and injured when his back struck the tandem wheels of the flat bed truck. Later that night, he was taken to West Jefferson General Hospital where he was examined by Dr. William Bagnetto, who was in family practice and formerly the police department’s physician. Dr. Bag-netto found tenderness in the lower lumbar spine area and was of the opinion the claimant had sustained a contusion of the lower back. Hence, he referred the claimant to Dr. Joseph Frensilli, an orthopedist, for treatment. On the day following the incident, x-rays of the back were taken, found negative, and the claimant was discharged by Dr. Frensilli on March 9, 1974. Since that time, Mr. Chabert has been examined and treated by numerous physicians and has undergone exploratory surgery, a spinal fusion operation, been placed in traction, and has received extensive therapy.
On June 4, 1974, Mr. Chabert filed in District Court a “Writ of Mandamus to Compel Performance of Administrative Duty”, i.e., a determination of whether he was entitled to a disability pension under LSA-R.S. 33:2234(A), which provides:
“A. The board shall retire from service in the police department any member of the department found by a majority vote of the board to have become physically or mentally, permanently or temporarily, disabled while in the performance of his duties, as determined by the report of the department physician, and shall place the retired member on the pension or relief roll.”
The Board first discussed the claim on June 16, 1975, at which time the claimant was a member of the Board. It did not grant Chabert’s request for disability benefits because the evidence was not conclusive as to his disability. It recommended he be examined by Dr. Irvin Cahen, a physician selected by the Board to determine whether, as required by LSA-R.S. 33:2234(A), Chabert was disabled. The Board held a hearing to take evidence. There was considerable testimony as to how and why the altercation between the claimant and Mr. Tassin occurred. From this evidence, it is apparent there had been some previous disagreement between them, the extent thereof depending upon whose version is accepted. On November 5,1980, the Board denied Mr. Chabert’s claim for the following reasons:
1). The Board refused to accept Mr. Chabert’s version of the arrest or the manner in which he said the injury occurred.
2). The Board expressed grave doubts as to whether the claimant’s action in arresting Mr. Tassin was “while in the performance of his duties” as a police officer.
3). That Mr. Chabert was not disabled, and if he was disabled, then that disability was not due to the occurrences which took place on February 24, 1974.
Mr. Chabert sought judicial review in the District Court of Jefferson Parish based upon the provisions of LSA-R.S. 49:964. The trial judge held the Board erred in failing to find Chabert was in fact injured and that the injury occurred while Chabert was performing his duties as a police officer. He concluded, however, that the Board was correct in finding lack of disability as that term is defined in LSA-R.S. 33:2234(A) and a lack of connexity between the disability, if any, which now exists and the injury which occurred while Chabert was performing his duty as a police officer.
*1192 Dr. Lubin, a psychologist, and Dr. Irvin Cahen were the doctors selected by the Board as the Department’s physicians to make the disability evaluation required under LSA-R.S. 33:2234(A). The claimant refused to go to Dr. Lubin because he said “it was his back which was hurting, not his head”. He did go to Dr. Cahen. In his report of July 30, 1975, Dr. Cahen gave the following as the claimant’s medical history:
“This patient has indicated the development of backache as a result of injuries sustained while on duty for the police units of the City of Westwego. On the date noted above in an encounter with a male, for purposes of arrest, the patient was thrown against a trailer body impacting the elbow and vertebral zone. The patient states that the force of the impaction was primarily across the back as his body hit the wheel of the vehicle. He was not rendered unconscious by the accident and initially did not experience acute pain. Later, however, he became aware of progressive pain across the back extending into the pelvic zone and was aware of stiffness of musculature. Later on, when he attempted to get up from a seated position, he stated that his legs gave out beneath him and he fell down. Accordingly, medical attention was requested and he was referred to the West Jefferson Hospital where he was admitted for treatment. This therapy included bedrest and traction for approximately two weeks. X-ray studies were taken of the vertebral zone and he was advised that there were no fractures. The patient was later fitted with a corset support and permitted to return to his home where he continued at bedrest.
Secondary involvement developed with difficulty in urination which the patient appeared to be more prevalent at night, and he was referred to the Ochsner Foundation Hospital for additional evaluation by a neurologist. Myelogram studies were completed and apparently reported as not presenting findings of disc protrusion. He was advised by his physician that the lack of urinary control was probably due to his medication.
After being discharged from the Foundation Hospital the patient received various forms of physical therapy for several months. He claimed however that backache persisted and no definite improvement occurred.
The patient again changed physicians and was seen in consultation by another orthopedist who referred him to Touro Infirmary Hospital. At that Institution additional studies of myelography and discography were completed, but the findings were not definite according to the statement given to the individual.
The patient states that he remains under the care of these physicians who have advised that if he does not improve with continued routine treatment, he would probably' have to be re-admitted to the hospital for exploratory vertebral surgery next month.
The patient is at present complaining of pain across the back which is increased after standing and walking. It is also present at night even though he is at bedrest. He says that he is unable to sleep and is becoming very apprehensive about his future. He has been seen by other consultants who have not offered additional treatment.
The patient states that he was treated by epidural block at one time in February of 1975 but this did not offer specific relief. He is having more pains in the left side than the right and has recently experienced intermittent numbness of both feet. He says that this reaction seems to come and go.
The patient has not been able to return to work for the present time because of his abnormalities as described and has more or less remained at home.
The patient indicates that treatment has also utilized corset support which did not relieve the backache. He was also placed in a plaster cast for awhile but this immobilization did not relief back pain. He has lost approximately seventeen pounds over the past few months.”
From his medical examination, Dr. Cahen made the following observations:
*1193 “With the patient disrobed and in standing in the upright position, inspection of the vertebral zone reveals no disalignment. There is no scoliosis. Palpation of the paravertebral musculature does not indicate spasm. Trendelenburg tests are negative to instability at this time. In forward bending, the lordotic curvature gradually reverses. The patient is aware of tightness in the left ilio-lumbar zone with this effort.
Right and left lateral deviation presents symmetrical mobility. In flexion and extension, the patient refers to backache at the lumbosacral level as well.
The supine attitude is assumed without difficulty. Straight leg raising permits elevation through an arc of seventy degrees. Hamstring muscle tightening is noted. There is no sciatic pain referral with these manipulations. Kernig tests are confirmatory. Crossleg tests are negative for acute iliolumbar involvement. In the prone position, Ely tests are negative for lumbosacral pain. There is no tenderness upon pressure over the sciatic notch and the course of the sciatic nerve. Palpation over the lumbar area in prone position elicits a complaint of backache. There is no reference of sciatic pain however.
Measurement of the lower extremities note equal length. There is no atrophy of the thigh or calf musculature. General mobilities of the hip, knee and ankle articulations are complete. There is no peripheral edema or tarsal induration.
The patient is able to ambulate in both the equinus and calcaneal positions. There is no apparent weakness of the extensor musculature of the foot or toes. An incidental finding is an operative scar at the pilonidal area in the sacral zone about two inches in overall length. This is the residual of an operation in 1960 for a pilonidal cyst while he was in the Armed Forces.
Reflex responses of the lower extremities are active and symmetrical. No abnormal reflexes are noted. There is no abnormal reaction to sensory integumental stimulation.
X — RAYS: Multiple views of the vertebral zone reveals no disalignment. Vertebral bodies are generally uniform in height, width and density. However, superior margins of the first lumbar segment and the adjacent inferior margin of the 12th dorsal segment are irregular in outlines suggesting residual change of prior epiphyseal variation. The findings do not have the appearance of recent osseous trauma but there is narrowing of intervertebral space in contrast to the remaining lumbar segment.
There is no wedge compression deformity although the anterior body height of the first lumbar segment is slightly more narrow than the other zone. There is no indication of specific fracture or dislocation. In oblique projection there is no spondylolysis. There is no spondylolisthe-sis and the sacro-iliac synchondrosis are patent. Densities in the soft tissue adjacent to the vertebral margins suggest calcification possibly within the larger vessels notwithstanding this patient’s age group. In oblique projection, osteophytic spurring is noted in the superior margins of the first lumbar segment.”
Based on these observations, the doctor reached the following conclusion:
“The clinical history has indicated injury to the vertebral zone as the result of an accident on February 24, 1974. The mechanism of this trauma may be associated with the patient’s complaints of pain initially involving the vertebral zone and the examiner would correlate a diagnosis of contusion with assumed muscle spasm. However, the patient’s complaint pattern has persisted over a period of many months notwithstanding prlonged therapy of various modalities. This type of syndrome is unusual and does not correlate physical abnormalities of the muscu-loskeletal system.
The patient has been examined by several specialists and diagnostic aids such as x-ray, mylography and discography has not revealed abnormality of traumatic pathology. The examiner has renewed rec *1194 ords of these tests at Touro Infirmary. The myelogram of February 18, 1975 is negative. There is no irregularity of the column at the 12th dorsal — 1st lumbar level to indicate developmental narrowing of the intervertebral disc.
The discogram has been reported as follows:
A needle was inserted into the interspac-es of L3-L4, L4-L5 and L5-S1. Contrast material was injected into the disc of these spaces. There is no evidence of herniation of the disc form any of the interspaces.
The examination of this patient as of July 23, 1975 does not reveal objective abnormalities of the musculoskeletal system as related to trauma. There are no present findings to indicate operative intervention of the lumbar zone.
From the orthopedic standpoint, this examination does not reveal objective abnormalities to account for the patient’s prolonged complain pattern. Accordingly, this examiner does not offer additional specific orthopedic therapy, but would advise that this patient be managed to return to general activity if other neurological consultation is also without objective findings.”
Reports by Drs. Bagnetto, Frensilli, Connolly, Hamilton, Brent, Redler, Llewellyn and Whitecloud were also submitted in evidence. These reports were all predicated on examinations, observations and treatments made after the alleged injury, and in essence, support the medical history, observations and conclusions drawn by Dr. Cahen which are that the claimant was injured in the altercation, the injury was a contusion and strain of the back and aside from this, there is no indication of an orthopedic or neurological injury to the back. The medical opinions which differ from that given above are those of Dr. Whitecloud and Dr. Philibert. Dr. Whitecloud’s report differs because he performed a surgical exploration and subsequently a bone fusion of the lower lumbar to stop the pain caused by a degenerative disc disease. None of these doctors have a medical explanation for the claimant’s continued complaints. Dr. Philibert’s report is entirely different from the others because he assigns medical reasons for the continued complaints of pain. He was in family practice and an abdominal surgeon who operated a pain clinic. His report of January 7, 1977 provided as follows:
“On September 24, 1976 I saw Mr. Cha-bert who stated that he sustained a back injury while working as a deputy sheriff on February 24, 1974. He described numerous doctors and treatments and admissions to hospitals and stated that in-spite of everything that had been done for him in the past that he was still having severe pains in his back. Complete examination at this initial visit revealed point pain to palpation examination to L2-3-4-5, SI of the lumbosacral spine, both sides of his sacroiliac and his sciatic nerves in general. Mr. Chabert was examined, marked, re-examined and the examination was done on three different occasions during the same visit and each time the examination was done it confirmed the findings of the other two previous examinations that certainly he had objective evidence of pain; was not malingering; and definitely had bonified objective evidence of injury of the spine. Mr. Chabert was treated with injection therapy of injecting these trigger areas with a 1% Hydrocortisone Acetate solution in lh% Xylocaine Hydorchloride with satisfactory results. Whereas he could hardly move prior to getting on the table, examination following the treatment revealed an absent of pain following treatment. This progressed very satisfactory and well on Mr. Chabert from September, October and November but inspite of treatment he kept getting recurrences. Mr. Chabert stated that he had been to numerous neurosurgeons and neurologists for the back trouble and the spasms that he was getting but could not really describe the spasms in a particular manner that was evident. The problem develops here that Mr. Chabert had an injury apparently which had some underlying factors that was causing the injury to continuously recur.
*1195 Therefore, on November 16, 1976 Mr. Chabert was put in Metairie General Hospital where he was worked up to elemi-nate any central nervous system damage of an intrinsic nature. Fortunately, he was observed during one of his spastic type of seizures and it was concluded by Dr. John Jackson, who happened to walk into the room at the time he was having an extraparamidal seizure due to medication which he had been given at a prior time. With the realization that Mr. Cha-bert was not merely having spasms in the back but in actuality was having a drug induced extraparamidal seizures he was placed immediately with an injection of Cojentin and placed then on Conjentin tablets twice a day and the extraparami-dal seizures and spasms in the back have completely subsided with the onset of this medication. Following this he was again given at periodical intervals injections into the injured areas of his back with the same previously mentioned solution of Xylocaine-Hydroeortisone with very satisfactory results.
Mr. Chabert is finally responding to treatment and is having now longer terms of relief than he had had prior to the diagnosis of the extraparamidal seizures that he was experiencing. In retrospect we can now appreciate the fact that Mr. Chabert’s injuries were being complicated by extraparamidal seizures which were causing such muscle spasms as to actually reinjure the contussion of his lumbosacral region each time he had a seizure. As now can be appreciated, without the seizures complicating the treatment he is getting satisfactory progress in the elieviation of the severe pain he had been experiencing all this time.
At the present time Mr. Chabert is totally and permanently disabled and it is not conceivable in the immediate future that he can return to gainful employment for the near future. It is always hopfully anticipated that a physician will cure his patient and this is the effort that I will extend to Mr. Chabert to best of my ability to treat him in such a manner as to finally cure him of the injuries he sustained. There are many months of treatment ahead of him before final resolution of the injuries he sustained can be a reality. In the mean time, this is to confirm the fact that Mr. Chabert is totally and permanently disabled since the onset of the accident to the present time and for the immediate future he remains totally and permanently disabled. DIAGNOSIS: Severe contussion of lum-bosacral and sacroiliac spine. 2. Drug induced extraparamidal seizures due to either Thioziades or Reserpine type drugs.
DISCUSSION: In a review of Mr. Cha-bert’s medication certainly a Thioziade drug had been used on him previously and this of course is not an unusual situation for these drugs to cause extraparam-idal seizures. Certainly the drug was of need apparently in the early stages of his treatment to elieviate the anxiety and emotional trauma that is associated with back injury. However, in the process of treatment of this continuous use of Thioz-ides cause a perputation of the extrapar-amidal seizures which in turn complicated the initial injury he sustained to began with. It is like the dog chasing his tail. The more the tail is chased the more vicious the cycle becomes and actually never catching quite up with the tail. Extraparamidal seizures are somewhat similar to this insofar as long as medication is given of a nature which will aggraviate the seizures they will continue and actually get worse. The one factor which must be considered is the possible irreversible damage that can sometime be caused by the use of extraparamidal drugs. The irreversable damage of the extraparamidal seizures especially that of tardive dyskinesia must be considered and must be observed for in the future. It is not to be implied here however that Thioziade drugs should not have been used on Mr. Chabert. It is to be emphasized that certainly these drugs and quite often are of great value in relieving patients with back injuries insofar as they *1196 increase the tolerance for pain and also at times are of a benificial nature to the neuralgia reaction that occurs associated with back pain. The problem as has already been mentioned is that the medication caused extraparamidal seizures and should have been stopped on a prior date but the complication of such a diagnosis is that to appreciate the spasms as described by a patient and to conceive the fact that these spasms are actually of a extraparamidal seizure are very difficult to be diagnosed insofar as the description of the patient does not always coincide with the physicians appreciation of an extraparamidal seizure. The diagnosis can quite often be very difficult to make and is most often made when a physician sees the patient in such a seizure. Again the problem exist that most of the time the seizures are often gone by the time a physician gets to the patient to try to observe what he is experiencing. Nonetheless the diagnosis was made, the ex-traparamidal seizures have been corrected and the therapy he is now receiving is of a very beneficial nature insofar as the persistent and constant pain of which he was experiencing is gradually subsiding.”
The standard for appellant review set out by our Supreme Court in Canter v. Koehring, 283 So.2d 716 (La.1973) is as follows:
“When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.”
Even though the standard of “ordinary error” as opposed to “manifest error” may be the applicable standard of review because the medical evidence was submitted by depositions or reports in lieu of live witnesses, we cannot say the trial judge erred in accepting the medical report of Dr. Cahen as supported by the other doctors over that of Dr. Philibert. There is a total lack of connexity between the injury which occurred on February 24, 1974 and the condition in which Dr. Philibert found the claimant at the time of his examination.
Accordingly, the judgment of the trial court is affirmed. All costs of the appeal to be borne by the appellant.
AFFIRMED.